Good morning, your honor. Thank you. Judge Smith, Judge Loken, Judge Grunder, good morning. My name is Steven Morrison, and I represent Timothy Burns in this matter. We've argued a lot of issues, but for this oral argument, unless the court wants me to take a different direction, I'd just like to drill down on the insufficiency of the evidence claim and request that this court vacate my client's convictions and remand for further proceedings. My client was either convicted on an actual fraud theory or a willful blindness theory. Given the jury question, it seems clear that the jury found my client guilty on a willful blindness theory, so I'd like to address that, but if this court believes that I need to address that. I know your argument is based on that assumption, but the question I ask myself and now I ask you as I read your sufficiency of the evidence argument, what if we conclude the evidence was sufficient to find the actual knowledge? Then I would proceed to my, I believe, my fourth and fifth issues regarding the need for jury unanimity. Now, I admit that under Eighth Circuit jurisprudence, that is absolutely a stretch, but you know, after the outcome of this case, perhaps the U.S. Supreme Court would like to consider that. I don't know, but I think that under either a willful blindness or actual fraud theory, there was insufficient evidence, and let me just take the willful blindness theory first. As far as require, well, to find somebody guilty on a willful blindness theory, you need that person to believe that there's a substantial likelihood of fraud going on and conclude that that person actively avoided learning about that fraud. Now, here, the government relies on Burns' access to two of Reitzman's accounts in support of its notion that Burns knew about Reitzman's fraud, but of course, Reitzman might have had other accounts. But even more importantly than that, there's really no evidence that my client did anything more than act recklessly in regard to the fraud going on around him, and recklessness is not enough for willful blindness. He never did anything to actively bury his head in the sand. So that's why... Counsel, this is Judge Smith. What about his misrepresentations about the state of the investments itself, the state of the investment itself, that there was this money there and that this money was, he was not forthright, even with the people he had hired to sell this investment, was moving monies around in his businesses, making this representation that he was going to be the main contractor to the construction of the facility and he was going to get a million dollars. He didn't disclose that to the people who were selling the investment, vital information that would have tipped off people to the given suspicions to the nature of this enterprise. Let me just say that this is not an investment that I would have put my own money into. It was sloppy. It was unprofessional. All across the board, happy to admit that, but let's take your comments in order. First of all, the email regarding the finances that he sent to Charlson and Selberg, in the investors, these numbers are not accurate. Now, you could argue, well, Charlson and Selberg testified that Burns told us to give this and other information out, but Charlson and Selberg are not credible in the least. These are supposedly investment experts, but they didn't know about private placement memorandums. They didn't know about state bonds. They apparently hadn't read the PPM, which said there would be no escrow, and they comment on the insanity of this contract that Burns got. Counsel, you can't argue the credibility of a witness to an appellate court when the issue is sufficiency of the evidence. Well, I just think you can make a pass at it, but you aren't going to get anywhere emphasizing it. Well, didn't they testify that Burns repeated the false information at a meeting, some of it at least, at a meeting with investors? And if the jury believed that, then that's pretty damning. There was one meeting where Charlson and Selberg were making all of the representations. They turned to Burns and they said, hey, there's 5.6 million, right? Burns said yes. At that point, I don't think there's any evidence that Burns knew that that was false. As far as arguing the incredibility of Charlson Selberg, absolutely, Judge Loken, that's an uphill battle. But the standard on insufficiency of the evidence is not that there is no evidence, but it's that no reasonable juror could believe that evidence. And so with Charlson and Selberg, these guys are one of two things. Either they're completely incompetent, so any comment they make about this investment can't be trusted, or they themselves are the major fraudsters, in which case they can't be trusted. And in my opinion, no reasonable juror could conclude that they're to be believed. But what could the jury conclude about Mr. Burns's actions with respect to the invested money and his other businesses? Absolutely, Your Honor. Well, there seems to be no doubt that Burns was having money troubles, but that is not an element of the crime. If I had a contract that permitted me... It would certainly go to whether they would believe him or not. It could certainly go to whether the jury believed Burns or not, but I think that's independent of Charlson and Selberg. But as far as the money transfers go, we have a contract in which Burns is contractually able to receive up to a billion dollars prior to him spending any money. He does that. He puts it in his own accounts, at least some of which are accounts for businesses that are going to be used to fund this program. Was that factually established on the record, his ability to receive a million dollars? It was in the contract that he had with Reitzman. There was the million dollar contract and then the, I think, three hundred and twenty thousand dollar contract. He wrote and signed the contract himself, right? Isn't that what the evidence was? My understanding is that he did write the contract, but both parties agreed to it. And there was he signed it. He didn't mean Reitzman didn't sign it or did he? I don't think. I believe Reitzman said he didn't know about it. Well, if Reitzman didn't sign it, it can't be a valid contract. And I would have to check, Your Honor, but I think Reitzman did sign it. And there was no evidence put on the record that it was an invalid contract. Now, Charlson and Selberg said it was a bad idea financially. And maybe I would agree with that. They speculated that it was somehow a way to cover Burns's fraud. But that's just speculation. And let's keep in mind, the government's own financial expert was unable to establish that Burns spent one dollar of this project's money on himself. The expert speculated to that, but could not establish it. What he could establish was that Burns spent a great deal of money on this project and that money came from his private accounts. So you've got money coming from the project into his private accounts and the outflows are going to the project. And if I'm a subcontractor and I get money for a project, first place it goes is one of my private accounts. And under the terms of the contract, Burns's obligation to do what he didn't do was never triggered because he never actually received the one million dollars. And I have to revisit this. This whole plan, frankly. He got some of it, right? He certainly got funds, but the government financial expert was unable to establish that he spent any of those funds on himself. The financial expert was able to establish that he did spend, well, hundreds of thousands of dollars on the project itself. How much went to the land? It went to the land. How much went to the land? I believe the earnest money was a couple hundred thousand dollars in that ballpark. I, you know, give or take fifty thousand dollars. I think that's about it. The government's brief says fifteen thousand. I could stand to be corrected. I believe it's more, but the agreement was for two hundred thousand and Mr. Burns paid fifteen thousand earnest money. And never paid another penny. And if that's what the government says, I haven't obviously read the transcript. And if that's what the government represents, I looked at the government's brief and on that count, I have no quibble. But he also didn't pay salaries to Charlson and Selberg. He made other expenses on this on this project. So, you know, you don't actually need to have gained to be guilty of wire fraud. But the lack of gain is certainly evidence of lack of fraud. And, you know, there's there's other points I want to make here. There are. I don't understand how that statement holds, that the lack of gain is the lack of fraud. You just may not be good at it. Agreed. You could be quite dishonest. I think there are a lot of frauds that are attempts to save a sinking ship that sinks anyway. I may have misspoke. What I what I meant to say was the lack of financial gain is evidence of lack of fraud. It's not dispositive proof. But if you haven't gained anything and if the government is unable to present evidence that you did gain anything, that's evidence of lack of fraud. And to that, we have a lot of checks and balance. We have a lot of checks in this system. We have Charlson and Selberg who are legally obligated not to provide investors any information outside of the PPM. But they weren't given the full picture. They didn't know he had a million dollar contract that was going to pay him before anybody else got it done. They didn't have to have that to do their job. They were given the PPM. Counselor, you're in your rebuttal time. You can continue if you like, or you can reserve. Thank you, Your Honor. I think I'll reserve the remaining couple of minutes for rebuttal. Mr. Parsons. Thank you, Chief Judge Smith. And may it please the court and my friend, Mr. Morrison, the evidence of fraud in this case was strong enough that the defendant did not make a motion for a judgment of acquittal at the close of the government's case. Counselor, this judge welcome. You can go ahead with the argument as you want, but I'll tell you from the front end, my main concern is that the government overreached in requesting that willful blindness instruction. I read Barnhart and you say it's distinguishable without explaining why. I find it very hard to distinguish. So I hope you get there. I will. I'll go straight to that, Judge Loken. The best evidence of whether he had actual knowledge, we certainly believe he had actual knowledge of the fraud, but the juror might conclude he was willfully blind and it must have been one or the two. Either he knew what he was saying to these salesmen was false. He admitted that on the stand. First of all, tell me what fraud he was deliberately ignorant of. Because I find the briefs very confusing as to just what was the underlying fraud or frauds here. First of all, primarily the financial picture of the company. It was suggested in the PPM that they had $5.6 million on hand, so they would have 51% of the equity of this $11 million project that was represented to everybody. That's not fraudulent. Well, and so that caused questions to be raised. Well, can we see that your balance sheets and the salesmen were told that they had this $5.6 million when the salesman kept getting pressed by investors? I'd like to see a balance sheet. Where is this money going? Do you have the $5.6 million? The salesmen were getting frustrated because when they would ask Mr. Burns about that, the defendant, he would say, don't worry about it. It's handled. We got it. So with all respect, you're just talking about a bad deal. Well, let's get to the fraud. Now, I gather that Reitzman pleaded guilty to a fraud. I thought the fraud would have to be either CNS lying to investors or Reitzman misappropriating investor dollars or something else. But nothing's ever clarified. Unless you can pinpoint a evidence of a fraud that he was deliberately ignorant of, you shouldn't have requested that instruction. Well, let me get to Exhibit 5. That's my proposition. I haven't obviously decided anything. No, I understand. Exhibit 5 is finally Mr. Burns, we want some documentation about this $5.6 million that you've told everybody you have in the bank at public meetings, angel investor meetings. So Mr. Burns created a lie and he admitted on the stand, everything in the email was a lie. And what he said was, I had Jack, which was his private bookkeeper, send me over the balance sheet, and it is not for public consumption at this time. Global Aquaponics has deposited $1.5 million in cash in the South Dakota food security account at U.S. Bank. That was a lie. They never deposited any cash. Global Aquaponics has already paid $2.2 million for the greenhouse structure. That was a lie. They never paid anything for any structure. Global Aquaponics has already has purchased $1.9 million in equipment. That was a lie. They never purchased any equipment. He's saying he's looking at the balance sheet when he's relaying this information to his salesman. And he says, I purchased these things through Global Aquaponics, which was the 51 percent mother company, and I have not cleaned up the purchases to get the securities name. That's the investor entity yet. So my reaction counsel is that that's evidence of actual fraud. Yeah, that's right. That's not deliberate ignorance. That's deliberate knowledge. It can be either because either that they did not. Barnard tells me it can't be either. I can distinguish it this way. It could be either because either he knew he was lying in the email. But he says, well, I assumed that we did have this 5.6 million dollars. That was his testimony. He said, I thought we had it. So he either knew they didn't have it and created those lies to satisfy the investors and the salesman. Or he said, I don't want to know if we have it or not. So I'm going to create these lies to satisfy the investors and the salesman. He may have said, I'm afraid to ask a rightsman if we do have this. Of course, he did have access to all the accounts. So he could have looked. And if he looked, he'd known that none of that money was there. But he claims he didn't. He testified he didn't. So he was putting on through his testimony a good faith ignorance defense. He admitted he lied in the email, but he didn't admit that he didn't know that they that they didn't have 5.6 million dollars. He testified they did. Mr. Parsons, maybe I can make this a little bit clearer. At least it was my understanding that Mr. Burns testified that he didn't look at the accounts and instead relied on Mr. Rightsman. Isn't that your deliberate ignorance hook here? That was his testimony. I don't think that was necessarily believable testimony, but a jury could have believed that. And that's why we needed the willful blindness instruction. I think he knew that there was nothing there from the beginning. We think this is an actual fraud case, but the defense he put on through his own testimony was, I didn't know. And so certainly the jury is entitled to the willful blindness instruction to make their assessment in his credibility and in whether he believed his lies based on knowledge or he believed his lie or he put forth his lies based on ignorance. It was one or the other. Either he knew it was all a fraud or he stuck his head in the sand because he didn't want to know that it was all fraud and he spewed out these lies to get other people to invest. Now, what would happen was he controlled the investor account. The only people whose name was on the account were him and his private bookkeeper. And so he would tell his salesman, and this is all, both his salesman testified and many of the victims testified. He said, we have the land already bought. That was a lie. He said, we have $5.6 million. That was a lie. He said, we have contracts in place already with distributors. The distribution line for the food and the fish, it's already in place. That was a lie. And he told the salesman to go out and make these presentations based on all of these lies. They had a groundbreaking. They told people we already own the land. They had a groundbreaking. State Attorney General was there with a shovel. They didn't even own the land. That was a lie. And they said, we have to have the groundbreaking so we can get people to invest. It will create investor excitement. So as soon as the money would come in $25,000 increments from the investors, the money would go to Mr. Burns. He deposited into the investor food security account, which only he had control over it. Almost, you can see the testimony of our investigator, Flanagan and FBI agent Special Miller. Almost immediately, the $25,000 goes into the investor account. It's going into all of his other businesses that same day. It goes into Multiply, it goes into Syntec, it goes into Oakwood Equity, goes into Concrete Contractors, goes into his t-shirt apparel company. And what it's being used for, it's being used to pay payday loans. He has payday loans, high interest loans. He's paying off his credit cards. He's paying off the vendors for these other companies that he's in debt. It's a sad story. Mr. Burns was hopelessly in debt. He was playing a shell game with investor money. And as soon as the money went in, it was gone. And so what happened eventually, the salesmen were suspicious. They would walk by. Mr. Burns was a wreck in the office. He was always looking at computer screens. They could see negative balances on the account. He would say, when's the next check coming in? I'll double your bonus, your commission. If you get a check in today, we need a check. He was stressed. He was a raging bull. So they were suspicious. So when he's on a Hawaiian vacation, a 10-day Hawaiian vacation, the bookkeeper and the salesman have a chance to meet without him there and compare notes, and she reveals there's nothing in the accounts. There's zero in the food security accounts. Well, the investors had raised about half a million dollars and it was gone. And there was nothing to show for it. Judge Loken, you're correct. The only payment ever made for the land was $15,000 and $185,000 that was owed. Not another penny was ever paid. After this started to crumble, there was two payments totaling $50,000 made to a contractor, then they needed another $819 for a building permit. That was never paid. But those things happened after the salesman and the bookkeeper confronted the other owner, Mr. Reitzman, who's also pled guilty to fraud. They were blowing the whistle, but the problem was they blew the whistle to someone who was also stealing from the money, the money from the U.S. bank account, which Mr. Reitzman had control over. And Mr. Burns also was on. Mr. Parsons, I want to ask you a question about another issue that was raised in the briefing and that has to do with the indictment and whether there's been a variance from the indictment, which you addressed that it wasn't raised or in the Mr. Morrison's opening remarks, but I'd like for you to address that issue. Thank you, Your Honor. I'd be happy to. There was no impermissible variance from the indictment. The charge here never changed. The proof never changed and the evidence never changed. The defendant Burns was always charged with wire fraud in counts three through seven in the indictment. He was never charged with conspiracy. So the fact that his co-defendant pled obviously changed our focus at trial, but it did not change the proof against Mr. Burns. And that is that he, along with Mr. Reitzman, issued this PPM, which made representations that weren't true. That they had this land, that they had $5.6 million in equity. And then Mr. Burns made additional representations about contracts in place and how that money was going to be spent. And we've already bought the equipment. We've already bought the structure and used that to defraud all the investors and all the money then disappeared, except for the money that went to pay salaries of these salesmen, the $15,000 that went to try to purchase land. And then these kind of after the fact contracts with a subcontractor after he'd been confronted by the salesman and the bookkeeper that there's no money here. We brought in $500,000 for this project. We believed in, they invested in it too, and the money's gone. Zero. What happened? He took it. It's gone. So I think the jury, there was, the charge never changed. And Judge Schreier, I think made a very good finding on this issue in her settling of the instructions. The jury was properly instructed. It was probably actual fraud, but this court is clear that even if there's evidence of actual knowledge, the willful blindness instruction is proper. If there's sufficient evidence to support an inference of deliberate ignorance, that's the Highland case. And there was, because he testified, I didn't know, but I still created these lies for you to tell the investors. I didn't know if we had the 5.6 million. I thought we did, but I didn't check. Even though he's lying and telling everyone, yeah, I spent it this way. There's 2 million went to this, 2 million went to this, and I put 1.5 million in the bank account. He either knew, which I think he did, or he didn't want to know. And so he, he lied based on not wanting to find out the truth. So this is a sad case. A lot of people were hurt and I have empathy for the defendant, but he committed wire fraud and a lot of people lost a lot of money. Jury heard all the evidence. Mr. Morrison's argument seems to be a jury argument. The jury heard everything he said. And they found him guilty unanimously on all counts. So I respectfully request that this court affirm in all respects. Thank you, Mr. Parsons. Mr. Morrison, you're about. Thank you, your Honor. The court's presentation just now highlights just how important it was for the court not to give that willful blindness instruction and how wrong the court was to do so. The government charged my client on an actual fraud theory. They proceeded to trial on an actual fraud theory and they continue to believe my client was engaged in actual fraud. He knew that that email he sent was a lie and yet they countenanced a willful blindness instruction to allow the jury to impose a compromise verdict based on an area of law that is incredibly confusing and difficult to understand and based on a theory of liability for which juries can easily confuse negligence or recklessness with the requisite mens rea. So the insufficiency of the evidence argument is certainly a jury question, but that improper willful blindness instruction is a question for the court. And I'm incredibly troubled that the government still believes this is an actual fraud case, but they're happy with giving the jury an instruction that they don't believe reflects the facts. And the jury was able to find my client guilty on willful blindness when all he might've been was reckless and economically distressed and frankly, in this case, not a very good businessman, but all of that is not fraud. The government says that Mr. Burns's failure to investigate amounts to willful blindness. This is Jed Smith. I have a question for you. The last issue you raised had to do with the district court, not Suspante polling the jury. Apparently that wasn't requested by the trial counsel. What you're addressing now certainly would have been an appropriate time to make that argument was when the case was still before the district court. Why isn't that issue waived? And if not waived, how does it meet a plain error test? Well, it, it obviously wasn't brought up in district court. It's something that, and I didn't represent Mr. Burns in the district court. It's something I would have liked to have seen. And if I'm being entirely frank, your honor, it's an issue that I spotted that certainly perhaps is waived and is subject of clear review, but I want to preserve it for the Supreme court. And here, why was this clear error? It was clear error. I'm sorry, plain error. It was plain error for, for all of the reasons the government just implied. They think it's actual fraud, but what the heck, let's allow a jury to impose liability on a willful blindness theory. But that's not what justice is. The government should go to trial with its theory, prove its case and stick with that theory. And in a case like this, where a jury could easily be divided between actual fraud and willful blindness, the court has a job to do in supervising that jury's decision to make sure that they're making the correct unanimous decision and create a record that we can analyze on appeal, but the district court didn't do that, which I think results in our conversation we're having today, which is one of not a little bit of confusion. Thank you, Mr. Morrison. Thank you also, Mr. Parsons, the court appreciates both counsel's presentations to the court this morning. We'll take the case under advisement and render decision in due course. Thank you.